Okay let's go. I'm pleased to sign the report. Good morning, your honors. I'll start with the idea that once I read a case out of the Court of Appeals and started out and said this is a charming miniature of a case and I know when you look at this it may not seem like a big case but my client is pushing 70 and I have a little bit of understanding what that means so here's how we got here. Mr. Francescon and Mrs. Francescon were married for a long marriage. It looks like a pretty successful marriage. They managed their money wisely but having raised their family they had had enough and they went their separate ways and they divided up their estate. This appeal just presents one small part of a dissolution of marriage. All during their marriage Mrs. Francescon and Mr. Francescon were married for a long time. Mr. Francescon had paid his wife's portion or fraction of her health insurance. At the time their marriage was dissolved it amounted to I think like $224 a month. He made these payments. This same insurance had been in effect all through the marriage. It was in effect when they dissolved their marriage and Mrs. Francescon kept it for over two years after the marriage. It was a very good plan by the way. It paid 100% of all of her medical expenses and she did incur some medical expenses during the two years. After their dissolution of marriage. Now the decree itself of the MSA incorporated into the decree said that he would pay her monthly health insurance premiums for her natural life. Pretty sensible arrangement given the length of their marriage. Now here's what happened. She had moved to South Carolina and while she was in South Carolina all of her bills continued to be paid. 100% by the way. This was a no deductible plan. 100% of her bills were paid. She decided to move back to Southern Illinois and when she did she changed her insurance from the plan she'd been under for many, many years to an Aetna policy. Now this almost tripled the monthly premium. Almost tripled the monthly premium. The trial judge thought that this provision was absolute, that it meant that he had to pay a co-fraction of the premium for any insurance. If the judge is right, Mrs. Francescan wanted the same insurance that U.S. Senators, federal judges, and presidents have. He was just stuck with it. My argument was then and it is now, if you look at this particular provision, the referent is to the insurance that had been in effect forever. That's the first thing. It only makes sense. But even if the judge had a problem with it, a marital settlement agreement like any other contract in this state, the covenant of good faith and fair dealing kicks in. Now we know that's not an independent covenant. You can't create a cause of action for it. But you have to look at the agreement with those lands or you're looking through those lands. Now here's what I've done to, I hope, assist the court. Mrs. Francescan said, and she testified, that she never even looked at the difference between the coverages when she changed. She never bothered to do that. But many years ago, someone had told her that the higher the premium, the better the insurance. Many years prior to her decision to make the change? Yes, many years before the marriage was dissolved. And that was her reason, two years after the marriage was dissolved, that she changed insurance. Now, she said, she testified, I never even bothered to look at the coverages. So you're probably wondering why in the appendix that I put the coverages in there so you could see. And the reason I did that, I wanted to show the court the insouciance on the part of Mrs. Francescan. Because as it works out, the coverage she had before she changed was better than the coverage that Mr. Francescan is now paying two and a half times what he would have otherwise had to pay for. Now, there's nothing worse than asking judges to do an accountant's work. So I'm going to give you a shortcut. In the appendix, if you go to appendix 28, which I think is E16 of the record, you will see a breakdown of the coverage and what he would pay for a hypothetical person, someone, an older person. In this case, they give the case of someone with diabetes, high blood pressure, and the like, under the policy or the program that was in effect when the parties dissolved their marriage. And then, I think in the appendix at A34, it gives a breakdown of the coverage that Mrs. Francescan, on her own, purchased two years after, not purchased, elected, two years after the parties dissolved their marriage. For a $9,000 hospital bill, it's $900 more for the policy that Mrs. Francescan selected. Now, she was asked, why did you do this? And her answer was, because the marriage settlement agreement says I can, and because I was told many years ago that the more you pay, the better the coverage. Let me ask you this, counsel. Yes, sir. Is she able to go back to the prior insurance? Is she precluded now because she's not? No. You make an election each year under the teacher's retirement system. But what it is, if you actually live in this area, southern Illinois, if you don't select the HMO that she was under for years, then you have to pay these super premiums for a different policy. It seems like I read that there was an argument on the wife's position that, well, look, the husband could have filed a motion to clarify or perhaps to modify, and what's your response to that? Well, first of all, she could too. I mean, she's the one that's wanting to buy another insurance policy, a different policy, and there's nothing in the marriage settlement agreement that says that he doesn't get to pay it. It just says he will pay her premium. But the decree itself, like most of these marriage settlement agreements, has a provision that says it can't be modified. In other words, the finality was what was wanted. Finality. Of course, we didn't get it, but that's what was wanted. But here's the thing. Ordinarily, in ordinary life, when you pay for something, you have something to say about what you're getting, and he's agreeing to pay for it. But in this case, I don't think the court really has to go that far. I mean, the reference is to the per-insurance premiums, and he'd been paying them for all their marriage. All their marriage. Paid them at the time the marriage dissolved. And that would have been the time, if Mrs. Francescan wanted something else, you would negotiate for it then and work it out. But she did this for no good reason. And I probably, which I'm a specialist at, irritated the trial judge when I said she just did it for spite. And she did. Now, there's a better way to put it, but that's the reason she did it. Because she ended up with less than what she had. At two and a half times the cost to Mr. Francescan. And it's in the appendix. You can just look at it. It's just there. She had a no-deductible insurance policy that paid her bills when she was in South Carolina, when she was in Illinois, and would continue to do so. Now she's got a $500 deductible policy with different co-insurance payments. So, does the court have any questions? That's my case. Thank you. Can you identify yourself for the record? Oh, yes. Counsel, can you identify yourself for the record? Oh, I'm sorry. Patrick Murphy. Murphy and Murphy LLC. I'm the junior partner. Thank you. Emily. Thank you. Good morning. My name is Michelle Schaefer. I'm here for Teresa Francescan, the appellee. May it please the court. Pat and I tried this case, and I was interested in his legal arguments. He's always creative, and I enjoy cases with Pat. But I think what's most important in this matter is to focus on what we're really considering, which is the contract between the parties. Yes, this is a divorce case. Yes, there's emotion involved, and people like to use the word spite. And she did this to get him. But they were married for over 30 years, and they had a provision contained within their marital settlement agreement, which is in the record of C-21. You all have that before you. But it very specifically says, without ambiguity, without confusion, and very concisely, quote, husband will pay wife's monthly health insurance premiums during his natural life until such time as wife remarries or cohabitates. There's no confusion there. It doesn't say husband will pay the policy that's in existence at the time of the divorce. It doesn't limit what the coverage will or shall be. It doesn't state that in the event the policy exceeds a certain limit or monthly amount, the parties shall go back to mediation and discuss what is reasonable and necessary. It simply says husband will pay. And if there had been some extrinsic term that they wish to put in place, we have our appellate court and the precedent that we follow that says those terms had to be contained within there. Is there anything in any cases that you've seen that the term reasonable comes in? The term reasonable? No, Your Honor. In fact, in Ray, the marriage of Sawyer says there must be those extrinsic terms contained within that contract. She could be unreasonable under Sawyer. She could be because it says that those terms must be contained within that document. Now, if it had been ambiguous, he would have had the right to come forward to the court to ask for clarification. If there had been some confusion, he could have come forward to the court to ask for the court to clarify. But he did not. And the facts of this case, with all due respect to Mr. Murphy, when she came back from South Carolina, and this is in the record, she came back in June of 2018. She received a notice from the teacher's retirement system. She was a retired teacher. They had various listing of plans that she could be entitled to select. When she came back, she went to Mr. Franciscan's home to speak with him about these plans and about why he had not been paying what, in her understanding of the judgment, he should have been paying. He wouldn't speak with her. He told her to leave. He walked into a barn, shut the door, locked the door, told her to leave. He refused to communicate with her. And that was his own admission at trial. So when we talked about good faith and fair dealing, in our perspective, she made an effort to communicate with him, to discuss with him, and she made the election. As she had all along, post-judgment, with this policy. He admitted in trial, also in the record, that the premium had gone up during, from the point of the judgment, and since this election had occurred. And he admitted that he should have been paying the increased amount. Yet he had not. She went to him prior to making the election? She did. Okay. She went to him when she got back from South Carolina, which was the end of June. She went to him in the very early stages of July. The election and the first premium due was in September of 2018. And there is an exhibit that was presented to the trial court. I believe it was exhibit A or B, which is in the record in the E's, I know. I believe it's E23 through 27, which shows the premium amounts and when it did go from the 200s to the 600. But again, I think a lot of this is not relevant to the discussion, the fair dealing issue, because we have a contract. We have strict interpretation. We have conditions with an obligation to pay. Justice Overstreet asked about modification. We have Section 511 in the Illinois Dissolution of Marriage Act, which says if you wish to pursue a modification or even clarification, you can do so with the court if you believe that there is a disagreement between the parties as to an interpretation of a provision. That requires a written petition to be filed with the court to bring that issue to the court's attention. One cannot just simply avoid compliance when they don't agree with the interpretation. There was no petition filed by Mr. Francescan. He did nothing. But doesn't that go back to, I think, what Justice Overstreet asked, that paragraph 11 that states disagreement may not be modified for any reason? It does. It does. But then the question becomes, is that valid and enforceable because the Dissolution Act also requires there to be language under 503F that specifies the understanding of the parties that there shall be no modification and why. And that language is not in there. Now, I wasn't around when it was drafted. I don't know why that language is in there. But he could have filed a written petition. He could have asked for clarification. But he didn't. That's an unusual provision, isn't it? It's very unusual. It absolutely is because it doesn't have the requisite language under the statute under 503F. You know, and I don't know why. So is it ambiguous, that paragraph 11? I don't know. But that really wasn't the subject of any discussions with the Court because, clearly, in the evidence at trial, Mr. Francescan knew his obligation. He knew what he had to do. He understood that he had failed to do it. And the Court found, as a result, pursuant to the statute, that he had willfully violated his obligation under the judgment. And, as a result, found him to be in indirect civil contempt. And that included the increase under the old policy. You said that he had not paid the increase? That is correct. That is correct. And that was after he received a letter from my office on Ms. Francescan's behalf pointing out to him the amounts he had paid, the amounts he had failed to pay, and why she felt he was in violation, giving him an opportunity to respond, again, under this good faith and fair dealing, to avoid litigation entirely. That, too, was an exhibit that was presented in trial, to give him the opportunity to say, I don't agree with your position because. Let's talk about how we fix the problem. But he ignored that as well. Although he admitted under oath at trial that he knew he had an obligation to pay. He knew he should have been paying something. He knew he should have been paying increases, but he didn't. So it's not about who gets to pick because the contract doesn't say that. And all along post-judgment, to the point in time with the rule to show cause, Ms. Francescan, through TRS, through her union leader, even in retirement, had followed what had been recommended. And she did not testify that she did it because he had to. I pulled some excerpts when Mr. Murphy was talking in the record at 22. Why did you change the plan? She testified, quote, I have many health problems. In the record at 25, I need the best insurance coverage I can get. In the record at 24, you just want him to pay triple, don't you? Response, no. At that point in time, because I felt it was argumentative, I objected and that was sustained. Did she testify at all to why she believed it was the best coverage? She did, in fact. And she admitted she's not the most knowledgeable in the world about the coverage. And she didn't testify that 100 percent of her bills were paid by the HealthLink HMO plan. In fact, they weren't. What she testified to was that a majority of them, yes, were covered. But during the course of the marriage with Mr. Francescan, he also had Blue Cross and Blue Shield, which picked up the difference. So it was not burdensome to her. So when this divorce occurred, she maintained the same policy, and it did pay reasonably well. But she did have additional expenses out of pocket that she said, they weren't really significant. It's okay. I paid for them. It wasn't a big deal. But they didn't pay 100 percent. The big difference that she talked about was that the Aetna plan, which is $600 a month, has a $1,200 individual deductible. The HMO has a $6,600 individual deductible. There are substantial differences. Co-pays are pretty much the same, which is not going to be significant. The teacher's retirement system has a good health insurance coverage plan. But with her medical circumstances, she had a stroke right before one of our hearings, and we had to continue it. Her testimony, again, going back to some of the things she said, I had to have insurance. I had his insurance covering me as well. I felt protected then. I don't feel protected now. So it's not one of her failing to engage in good faith and fair dealing. It's one of her entitlement under the terms and conditions of the marital settlement agreement, an enforceable contract, one that's not ambiguous, one that's not confusing, one that he understands what he's obligated to do clearly, that he violated, that he is obligated to continue to pay, and that he should be obligated to comply with under the terms of the judgment for disillusioned marriage. Thank you. Thank you. Just two things, and I put this in the reply brief. There was a very, very good reason when Ms. Francescan presented herself at Mr. Francescan's house that he did not discuss much with her. She had obtained ex parte an order of protection against him that required him to go in and have it dissolved, it being without merit. So the man was a little worried about talking to her in person, and understandably so, and so he testified. Now, the second thing. It is absolutely the case that Mr. Francescan understood and knew that he would be, from time to time, responsible for the increases in the inevitable premiums. But here's what happened. He said he was never given notice of the increases in those premiums. She said, well, I sent him letters, but there weren't such letters produced or found. She said, well, I tried to call him, but he blocked my calls. His testimony was, I don't even know how to block a call. Don't even know how to do that. The trial judge never resolved that particular issue. Now, it is true, and I think this is important, too. Mrs. Francescan is the one that filed the petition for a rule of show cause. She's not asking for a construction of anything. She's saying hold the man in contempt. She's the one that did that, and when we filed our papers, if you will look, we would say, well, wait a minute. The defense to this is she just unilaterally, for no reason, changed her coverage. And one thing that's very important that you were just told, and I'm going to again refer you to the appendix in my brief. In the policy or the program that she had, there was no deductible. That is just a misstatement. In the policy that she purchased, or not purchased, she didn't pay for any of it, there is a $500 deductible. And I want to again refer the court to appendix, to my brief. It would be at 28, appendix 28, and then appendix 34, and look at the comparison of the coverages. My client is paying more money for less coverage for his ex-wife. Now, Justice Goldstreet, you said something very telling. And you know what? It is an unusual provision when you agree to pay your ex's health insurance premiums for the rest of your life. But after you've raised a family, you've raised two kids, you've been married for 40 years, and you've survived 40 years of marriage, which is more than a lot of people can say, it's not so hard to understand that you would feel some responsibility to take care of your spouse, even though your marriage didn't work out. And he doesn't. He doesn't. And you will also see in the record where he paid these monthly checks all the time. Now, when counsel says, well, I wrote him a letter, well, her letter was inaccurate. It was mathematically wrong. What she told him was not true. So our idea was, look, you're going to hold this man content of court who's been paying routinely, always, all the time, because he doesn't acquiesce in just a completely arbitrary election of policies. And this is way beyond the scope of what's reasonable. It's just not right. And here's the other thing. Here's the other thing. His duty to pay is absolute. I will grant you that duty is absolute. But there's nothing in that provision that says the wife gets to choose. Where does it say that? If she wanted to hold him in contempt of court, her job would have been to say, judge, I want to have a better insurance policy. And then we can come in and have a trial on what was the best insurance policy. But it's before you. You can look for yourselves. It's in the appendix. Thank you. Thank you.